CRAWFORD, *Plaintiff in Error*, v. ELLIOTT.

1. **Contracts, Construction of.** A contract which is not precise in its terms must be construed in the light of the facts and circumstances surrounding the subject matter it embraces.

2. **Case Adjudged.** A contract was made for the sale of the sound and dry corn in two cribs at a price seventeen cents below that of "No. 2 mixed corn" in St. Louis. It was provided that the corn should be kept dry so that shellers should have no trouble to keep the damaged separate from the dry and sound. Both parties knew that some was then damp. The seller reserved such as was damaged, and the purchaser agreed to shell and carry off the corn purchased at his own expense. In shelling the purchaser failed to separate the damp from the dry, and in consequence, some of the corn received in St. Louis did not grade "No. 2 mixed." *Held,* upon consideration of all the circumstances, that while the purchaser was not bound to take damaged corn, yet if he took it he was bound to pay for it at the price stipulated.

*Error to Pettis Circuit Court.*—HON. WM. T. WOOD, Judge.

REVERSED.

32—78

*Geo. P. B. Jackson* and *O. A. Crandall* for plaintiff in error.

*Ryland & Ryland* for defendants in error.

MARTIN, C.—This was an action to recover of defendants, as partners, a balance of account due on a contract for the sale of corn. The contract was as follows:

"HUGHESVILLE, May 15th, 1876.

"This is a contract made by J. B. Elliott, of one part, and G. W. Crawford of the other part, as follows: I, G. W. Crawford, sell to Elliott all my crop of corn, except such as I may want for farm use, and the damaged corn, if any; corn to be sound and dry. The price to be at seller's option, inside of fifteen days from the time the corn is shelled, and to be made seventeen cents below what No. 2 mixed corn is worth in St. Louis, at the time the price is to be fixed; corn is to be kept dry, so shellers will have no trouble to keep damaged corn separate from the dry and sound corn. I, G. W. Crawford, acknowledge the receipt of $500 as first payment on said corn. I, J. B. Elliott, agree to pay to Crawford as above stated for his corn crop, and shell it at Crawford's farm, and haul it to station at my own expense. I pay Crawford $500 at this date, and then pay all balance when corn is shelled and price fixed. This corn is all to be weighed at the station, Hughesville, and paid for as per weight on scales at fifty-six pounds to the bushel, shelled. If any of this crop of corn grades No. 2 white mixed, in St. Louis, then Crawford is to fix price, as in No. 2 mixed corn, seventeen cents below St. Louis price. The price of said corn is to be made by the quotations made at the elevator that Elliott may ship to.

J. B. ELLIOTT,
GEO. W. CRAWFORD.'

In the pleadings and on the trial it was admitted that

defendants were partners doing business and dealing in corn under the name of J. B. Elliott, and that the contract sued on was a part of said partnership transactions. There was no dispute about the quantity of corn received by defendants under the contract, nor as to the amount of money paid to plaintiff, it being agreed that the corn amounted to 3,500 bushels, and the money to $864.30. The plaintiff claimed $87.05 as still due him under the contract, which the defendants refused to pay. They claim in their answer that some of the corn so received by them did not grade "No. 2 mixed," in St. Louis, and that they were compelled to sell it at a loss of $87.05 in consequence of this fact, and that the amount to be paid plaintiff under the contract ought to be reduced in the amount of said loss, which, if done, would leave nothing coming to him. This difference has risen from the different constructions placed by the parties respectively upon the contract.

The trial resulted in a judgment for defendants under the construction placed upon the contract by the court in its instructions, which were as follows:

1. Under the contract sued on it was the duty of the plaintiff to deliver to the defendants none but sound and dry corn, and if he delivered to them corn not sound and dry, then as to such damaged corn, the plaintiff cannot recover in this action as for sound and dry corn.

2. If the court believe from the evidence that the corn was delivered to the defendants in such a damp and damaged condition, that by reason thereof, the price and value of the corn was reduced below the contract price to the amount of $87.05, then the court will find the issues for the defendants, if the court should further find that defendants have paid plaintiff all there was due him under said contract.

3. Although the court may find from the evidence that defendants' employes shelled the corn in question, yet it was not the duty of the defendants under the contract to separate and select the sound and dry corn from the damp

and damaged corn, so as to render them liable for all the damaged corn they shelled and shipped, as if the same had been sound and dry.

It is for error in these instructions, which were given at the instance of the defendants, that the plaintiff prose-cutes his writ in this court.

Whether the action of the court was correct in giving these instructions must depend upon the construction which should be given to the contract; and this is an undertaking not entirely free from difficulty and doubt. A contract of this character must be construed in the light of the facts and circumstances surrounding the subject matter it em-braces. The corn was raised in 1875, and was on the plaint-iff's farm in two cribs, each about thirty-two feet long by sixteen feet wide. One was inclosed with boards on the sides and ends about six inches apart, the other with rails, and both were covered with timothy and prairie hay. Elli-ott had seen the corn twice before the date of the contract with a view of buying it. He wrote the contract himself and testifies that he examined the corn before buying, and found both damaged and sound corn. It was shelled by one Rice as agent of defendants. Rice testifies that Craw-ford told him to keep the wet corn separate from the dry corn when shelling, and that he informed him that he had no time to attend to this instruction, and that it was not his place to do so. It seems that there was no rain to speak of during the shelling, but that the corn was not dry throughout. The plaintiff testifies that the corn was damaged and damp one foot in on the sides of the cribs. Four car loads were rejected in St. Louis by the inspector as damp, and the loss to defendants is claimed to have been suffered in these loads.

From the language of the contract and the circum-stances surrounding the subject matter of it, it is evident that Crawford contracted to sell to Elliott all his crop of corn except such as he needed for farm use and such as was damaged. The corn thus contracted to be sold to him was

the sound and dry corn of the cribs, and not the damaged corn. Elliott wanted only sound and dry corn, and did not want damaged corn. There was no representation or guaranty that any particular portion of the corn was sound or dry, or that any particular portion was damp or damaged; and consequently there was no warranty that any particular portion of it would grade No. 2 mixed or No. 2 white mixed. Both parties had seen and examined the corn in the cribs with a view to a sale, and from their own knowledge they must have been satisfied that the bulk of it would grade No. 2 mixed. The contract was evidently made upon this assumption, but it is an assumption arising upon the knowledge of both parties, and is not supported by any representation or warranty of the plaintiff. Nothing could grade No. 2 mixed which was not sound and dry. If there had been no corn of this grade in the cribs, or no more than the plaintiff required for his farm use, there would have been no subject matter for the contract of sale to take effect upon, and nothing could have passed to the defendants under it. The transactions would have been as null as the sale of a horse which both parties supposed to be living at the time of the sale but which proved to be dead.

Elliott was not bound to take anything but No. 2 mixed or No. 2 white mixed, which implied that it was to be sound and dry, and which the contract provided should be sound and dry; and Crawford was not bound to sell him anything else, and not even all of that, having the right under the contract to retain out of the cribs enough for farm use. That the bulk of the corn was expected to grade No. 2 mixed, and that the contract of sale applied to that grade, seems very apparent from the clause in the contract which provides that "if any of this crop of corn grades No. 2 white mixed in St. Louis, then Crawford is to fix price as in No. 2 mixed corn, seventeen cents below St. Louis price." No. 2 white mixed is known to be a grade a little above No. 2 mixed, being composed of about seven-eighths white corn, which is adapted to the manufacture of meal. Al-

though some of the sound and dry corn should exceed the grade of what the bulk of the crop was taken to be, nevertheless it was to be paid for at the same price. Crawford had a range of fifteen days after the corn was shelled to fix upon the prevailing price at St. Louis for No. 2 mixed. He was not bound to wait for shipment to St. Louis or elsewhere.

The corn was to be kept dry until shelled so that the shellers would have no trouble to keep the damaged corn separate from the sound and dry corn. I do not understand that the damaged or unsound corn was to be shelled at all. The parties to the contract evidently assumed that without more rain upon it the shellers would have no trouble in separating the damaged from the sound and dry corn. A dampening of the corn by rain would greatly increase the labor of separating the sound and dry corn from the corn so damaged by the rain, for the reason that a simple dampening does not produce any visible change in it at once, but only after the lapse of time. The corn purchased by Elliott was to be shelled by him, and the labor of separating damaged from sound and dry corn is expressly recognized as belonging to the shellers. Elliott seems to have regarded the task of shelling the corn as imposed upon him by the contract, and he undertook to perform it. But it seems that Rice, whom he hired to do the shelling, did not regard the labor of separating the corn as belonging to him in his contract with Elliott, and the result of an improper mixing of sound and dry with damaged corn is admitted by him in his evidence.

I think it more than probable that the depreciation complained of was caused by a want of care in separating. All that was done in this behalf was done by Rice who repudiated the obligation and admitted a partial non-performance. Delivery under the contract did not contemplate any distinct or formal act of Crawford. Possession of the corn was given to Elliott for the purpose of separating and shelling the corn contracted for. In separating and shell-

ing he exercised his own judgment in determining what came to him under his contract, and what did not so come to him. What he separated and shelled presumably belonged to him under the contract, and the title was perfected in him as soon as he had done this, in the absence of any objection on the part of Crawford or any refusal on his part to take what he had separated and shelled.

Under our construction of the contract the foregoing instructions were erroneous. Elliott was not bound to accept or ship any damaged corn. The duty of separating and shelling being performed by him, he ought to have separated, shelled and shipped only dry and sound corn. He had no right under his contract to take anything else. Crawford had the right to assume that all the corn which he took was taken under the contract. Nothing to the contrary was intimated by Elliott. No standard of payment is provided for anything else. If the depreciation resulted from negligence in separating, or if he took corn which turned out to be somewhat damaged by dampness, he has no valid claim for reclamation now, having taken the corn upon his own judgment as under the contract without objection. He had no right to take damaged corn under his contract, which had but one price for what was sold in it, and afterward insist on abandoning the contract price, and claim the right to pay what it was worth. The right to keep the damaged corn and to dispose of it to the best advantage, belonged to Crawford and not to Elliott. There is no evidence of fraud or negligence on the part of Crawford. There is evidence of negligence on the part of Elliott in the matter of separating the sound and dry corn from the damaged corn. Under the evidence contained in the record, it is our opinion that Elliott was bound to pay the contract price for all the corn taken by him. And as the amount of difference is small, and the case was tried by the court without the aid of a jury, we do not think it necessary to send the case back for a retrial, but will order an entry by the circuit court of the judgment which should

have been rendered. Accordingly the judgment of the circuit court is reversed, and the case is remanded with directions to enter a judgment in favor of plaintiff in the sum of $87.05, with interest thereon from the commencement of the suit to the date of the judgment, and for costs. WINSLOW, C., concurs; PHILIPS, C., not sitting, having been of counsel.